CLERKS OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

8/20/2018

JULIA C. DUDLEY, CLERK
BY:  s/ SUSAN MOODY
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **WILLIAM U.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No. 7:17-cv-240 |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | By: Hon. Robert S. Ballou |
| **Acting Commissioner of Social Security,** | ) | United States Magistrate Judge |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff William U. ("William"), proceeding *pro se*, filed this action challenging the final

decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and

therefore ineligible for supplemental security income ("SSI") and disability insurance benefits

("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383f. I conclude

that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I

**RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 13).

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to

support the Commissioner's conclusion that William failed to demonstrate that he was disabled

under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such

---

[1] Due to privacy concerns, I am adopting the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments

relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it

consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and

alterations omitted). The final decision of the Commissioner will be affirmed where substantial

evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

William filed for SSI and DIB in May 2014, claiming that his disability began on April

27, 2014. R. 182–99. William's date last insured was December 30, 2017.[3] R. 12. The state

agency denied William's applications at the initial and reconsideration levels of administrative

review. R. 60–105. On March 29, 2016, ALJ Geraldine H. Page held an administrative hearing to

consider William's claims for DIB and SSI. R. 33–59. William was represented by counsel at the

hearing which included testimony from vocational expert John Newman. Id.

On May 11, 2016, the ALJ entered her decision analyzing William's claims under the

familiar five-step process[4] and denying his claim for benefits. R. 17–27. The ALJ found that

William was insured at the time of the alleged disability onset and that he suffered from the

---

prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] William must show that his disability began on or before December 30, 2017 and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

Case 7:17-cv-00240-GEC-RSB   Document 17   Filed 08/20/18   Page 3 of 10
Pageid#: 566

severe impairments of coronary artery and heart disease with a history of coronary artery bypass grafting and stenting, history of heart attack, and obesity. R. 19. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 21. The ALJ concluded that William retained the residual functional capacity ("RFC") to perform a range of sedentary work. R. 21. Specifically, the ALJ found that William can: (1) stand and walk for two hours in an eight-hour workday; (2) sit for six hours in an eight-hour workday; (3) lift and carry five pounds frequently and ten pounds occasionally; (4) occasionally push and pull; (5) only work jobs that allow him to change posture in place every hour; and (6) occasionally balance, kneel, crawl, crouch, stoop, and climb ramps and stairs, but no crawling or climbing ladders, ropes, and scaffolds. R. 21–22. The ALJ found that William must avoid even moderate exposure to extreme temperatures, excess humidity, pulmonary irritants, and microwaves or electrical magnetic fields. R. 22.

The ALJ determined that William was not capable of performing his past relevant work as a garment folder, plumber's helper, and short order cook. R. 25. However, the ALJ found that William could perform jobs that exist in significant numbers in the national economy, such as assembler, packer/stuffer, and inspector/tester/gauger. R. 26. Thus, the ALJ concluded that William was not disabled. R. 27.

William appealed the ALJ's decision, and the Appeals Council denied his request for review on March 27, 2017. R. 1–4. This appeal followed.

**ANALYSIS**

William has a history of heart disease, including a heart attack in 2014. William also suffers from psoriatic arthritis stemming from his psoriasis. At the administrative hearing, William testified that he can only stand for five to ten minutes (R. 39), is fatigued "all the time"

3

(R. 39), can lift ten pounds comfortably (R. 40), and that sitting irritates his psoriasis on his backside (R. 40). William testified that he has not sought treatment for his psoriasis since 2013, despite having non-stop episodes that cover 90 percent of his body. R. 40.

In 2013, William received medication for psoriasis, hyperlipidemia, anxiety, and heart disease. R. 273. On April 11, 2014, William visited the emergency department complaining of left ankle pain and swelling for the past two months. R. 253. William reported increased pain that radiates up his calves after standing at work all day. Id. William's physical examination revealed swelling of his left ankle with decreased range of motion, psoriatic lesions over the soles of his feet, and severe psoriasis involving his face, neck, and arms. R. 254. The doctor recommended steroids and a brace, and released William back to work. R. 256, 259.

William followed up with Jason Meador, P.A., on April 17, 2014, complaining of swelling and pain in his left ankle. R. 269. William reported not taking medication for his psoriasis for the last three years. Id. William also reported occasional chest pain, shortness of breath, and palpitations in stressful situations. Id. Upon examination, William was alert and oriented, had psoriatic patches on his arms, had a normal pulse, had a normal neurologic examination, and had mild swelling and tenderness in his left ankle. R. 269. PA Meador assessed psoriasis and joint pain in his ankle and heart disease, and recommended medication. R. 270.

On April 27, 2014, William suffered a cardiac arrest and had an 11-day hospital stay during which he had a cardiac catherization and a defibrillator placement. R. 347. William began a beta-locker, an ACE inhibitor, aspirin, statin, and amiodarone. R. 351, 419–21. William was discharged from the hospital on May 8, 2014, with instructions to lose weight and stop using tobacco, alcohol, and illicit drugs. R. 419–21. The physician noted William's severe psoriatic arthritis and skins lesions and advised him to continue the clinical trial for anti-psoriasis

4

treatment. Id. William was also advised not to participate in martial arts until getting clearance from his physician. Id.

William followed up with PA Meador on May 28, 2014, with complaints of chest pain from compressions during his cardiac arrest. R. 267. William's physical examination was normal, aside from psoriatic patches on his arms. R. 268.

On June 23, 2014, William saw cardiologist Alan E. McLuckie, M.D., reporting that his chest hurt during breathing and that he had shortness of breath when walking any distance or climbing steps. R. 281. William's physical examination was normal, aside from significant areas of psoriasis covering his extremities and his chest, abdomen, and pelvis. R. 282. Dr. McLuckie checked William's defibrillator and ordered a follow up EKG. R. 283. Dr. McLuckie discussed the importance of lifestyle changes with William, referred him to cardiac rehabilitation, and instructed him to follow up in six months. Id.

On July 28, 2014, William was admitted to the emergency room for complaints of fleeting chest pain with sleep apnea, headache, and nausea. R. 287. An emergency room evaluation returned unremarkable findings. Id. William requested a refill of Lortab, but was prescribed Phenergan. R. 286–87. Thomas Bret Bolton, M.D., stressed the importance of follow up appointments with William due to his significant medical history. R. 287.

William was hospitalized on August 31, 2014 for intermittent sharp chest pains "after having a syncopal event and being found by police in the parking lot behind a building after he had been consuming alcoholic beverages." R. 296. Edward B. Humerickhouse, M.D., diagnosed a syncopal event associated with some runs of SVT on William's pacemaker. Id. Dr. Humerickhouse explained that William did not have any arrhythmic events on telemetry monitoring and increased his lisinopril. Id. Dr. Humerickhouse instructed William to follow up

with his physicians at New Horizons so that his ACE inhibitor and beta-blocker medications

could be increased to their maximum dosage. Id. Dr. Humerickhouse explained that William will

likely need a heart transplant in the future, which will require William to immediately cease all

use of alcohol, tobacco, and marijuana. Id. William was discharged in good condition on

September 1, 2014. Id.

William saw Afasana Widner, P.A., on September 11, 2014 to refill his medications,

explaining that he has been out of his blood pressure medication "for about a month." R. 483. PA

Widner explained that William has severe psoriatic arthritis, but has not followed up on available

injection treatment. Id. Physical examination revealed normal findings except for diffuse

psoriatic plaques on his body. Id. William's prescriptions were refilled, and PA Widner

explained that good control of his blood pressure though healthy diet and exercise were

necessary to prevent another heart attack. R. 483–84. William followed up on October 12, 2014

for a blood pressure check which was 142/98 and a pulse of 79. R. 479–80.

On November 5, 2014, William saw Dexter G. De Leon, M.D., to establish cardiology

care. R. 458. Physical examination showed normal findings except for generalized psoriatic

changes. R. 459–60. Dr. De Leon ordered an echocardiogram, and explained that if William's

"EF is still on the low side, we would possibly recommend [him] for transplant evaluation."

R. 460. Dr. De Leon stated that William may need aggressive cholesterol management, increased

Coreg and Lisinopril, and referred him to the defibrillator clinic and to dermatology for psoriasis

treatment. Id.

Two weeks later, William followed up with Dr. De. Leon on November 19, 2014. R. 466.

Dr. De Leon noted that William's current EF was 40 to 45 percent. R. 467. Physical examination

showed normal findings. Id. Dr. De Leon explained that William's echocardiogram results and

his "good functional capacity" obviated any need for a heart transplant. R. 468. Dr. De Leon

increased Coreg and Lisinopril, stopped Amiodarone, referred William to the defibrillator clinic,

and instructed him to continue a heart-healthy diet and perform activity as tolerated. Id.

The record contains three medical opinions regarding William's functional capacity. On

July 24, 2014, at the initial level of administrative review, state agency physician James Darden,

M.D., explained that William could perform sedentary work. R. 67. Dr. Darden explained that

William can: (1) frequently lift and carry 10 pounds; (2) stand and walk for two hours in an

eight-hour workday; (3) sit for six hours in an eight-hour workday; (4) occasionally stoop, kneel,

crawl, and climb ramps and stairs; (5) frequently balance; (6) never climb ladders, ropes, or

scaffolds; and (7) never be exposed to extreme temperatures, fumes, odors, dusts, gases, poor

ventilation, and hazards such as machinery and heights. R. 65–66. On December 1, 2014, at the

reconsideration level of administrative review, state agency physician Brian Strain, M.D.,

concurred with Dr. Darden's findings with the following changes: William can occasionally

crouch, is limited in reaching overhead on the left side, must avoid concentrated exposure to

vibration, and has no restrictions regarding extreme temperatures. R. 87–88. The ALJ gave

"some weight" to the opinions of the state agency physicians, explaining that the "objective

medical evidence from [William's] treating providers . . . support[s] a sedentary exertional range

of work" and that "the unspecified limitation in left overhead reaching by Dr. Strain is not

supported by the record." R. 24.

On August 31, 2014, Dr. Humerickhouse explained that William is "physically and

mentally incapable of performing work." R. 297. Dr. Humerickhouse concluded that William is

"disabled due to lack of exercise tolerance secondary to his chronic congestive heart failure."

R. 296. The ALJ rejected Dr. Humerickhouse's opinion, explaining that "the evidence does not

support a finding that [William] cannot perform a range of sedentary exertional work," William

was noncompliant with medical treatment, and he invaded the territory of the Commissioner by

stating that William is disabled. R. 24–25.

A treating physician's opinion which is "well-supported by medically acceptable clinical

and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in

[the] case record" will receive controlling weight. 20 C.F.R. § 404.1527(c)(2). The ALJ must

give "good reasons" for not affording controlling weight to a treating physician's opinion. Id.;

Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 256 (4th Cir. 2017). Further, if the ALJ

determines that a treating physician's medical opinion is not deserving of controlling weight, the

following factors must be considered to determine the appropriate weight to which the opinion is

entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of

the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's

consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R.

§ 404.1527(c)(2)–(5). "None of these factors may be omitted or disregarded by the ALJ in

weighing the value of a treating physician's opinion." Ricks v. Comm'r Soc. Sec. Admin., No.

2:09-cv-622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010) (citing Burch v. Apfel, 9 Fed.

Appx. 255, 259 (4th Cir. 2001) (per curiam)).

The Fourth Circuit reiterated in Monroe v. Colvin that an ALJ must "build an accurate

and logical bridge from the evidence to his conclusion," and the failure to do so is grounds for

remand. 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th

Cir. 2000)). "The failure of an ALJ to specify what treatment history or evidence does not

support a particular opinion means 'the analysis is incomplete and precludes meaningful

review.'" Knapp v. Colvin, No. 7:15-CV-348, 2016 WL 4447836, at *3 (W.D. Va. Aug. 1, 2016)

(quoting Monroe, 826 F.3d at 191), report and recommendation adopted, No. 7:15-CV-00348, 2016 WL 4482419 (W.D. Va. Aug. 23, 2016). Monroe confirms the ALJ's obligation to explain the conclusions reached and identify the record evidence which supports those conclusions. Only then can a court meaningfully review whether substantial evidence supports the ALJ's decision.

Although William suffered a heart attack in April 2014, his treatment has been conservative in nature, as his physicians prescribed medication and recommended a healthy diet, an increase in exercise, and an immediate ceasing of alcohol, tobacco, and illicit drugs. Physical examinations during the relevant period consistently revealed normal results aside from psoriatic changes. A heart transplant was ruled out after William started regularly taking blood pressure medication. Moreover, William's daily activities support the conclusion of the ALJ and the state agency physicians that he is capable of sedentary work, as William could lift 10 pounds comfortably, cooked for himself, cared for his basic needs, and engaged in martial arts.

Here, substantial evidence supports the ALJ's decision to reject Dr. Humerickhouse's opinion. The ALJ laid out William's medical history in detail, explained the opinion of his treating physician and the state agency physicians, and ultimately ruled that the opinion of his treating physician was inconsistent with the objective medical evidence, as the relatively conservative findings and treatment in the record are inconsistent with his conclusion that William is incapable of performing sedentary work. Substantial evidence also supports the ALJ's decision to accord some weight to the opinions of the state agency physicians, as their conclusions that William was capable of performing sedentary work are supported by the objective medical evidence.

## RECOMMENDED DISPOSITION

It is not the province of the court to make a disability determination. The court's role is

limited to determining whether the Commissioner's decision is supported by substantial evidence, and in this case, substantial evidence supports the ALJ's opinion. For the foregoing reasons, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case Glen E. Conrad, Senior United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

Entered:  August 15, 2018

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge